1
2
3
4
5
6
7
8

**UNITED STATES DISTRICT COURT**

9

**NORTHERN DISTRICT OF CALIFORNIA**

10
11

**HOSETTA ZERTUCHE,**

**Case No.: 11-CV-3691 YGR**

12

**Plaintiff,**

**ORDER GRANTING IN PART AND DENYING IN PART MOTION OF DEFENDANTS FOR SUMMARY JUDGMENT**

13

vs.

14

**COUNTY OF SANTA CLARA, *et al.*,**

15

**Defendants.**

16
17

Plaintiff Hosetta Zertuche ("Zertuche") brought this action under 42 U.S.C. § 1983, alleging

18

that she suffered adverse action by Defendants County of Santa Clara ("the County" or "County

19

Counsel"), James Gleason ("Gleason"), Sandra Eovino ("Eovino"), and Kimberly Maruffi

20

("Maruffi") (collectively, "Defendants") in retaliation for protected speech in violation of her First

21

Amendment rights.  Defendants moved for summary judgment on the grounds that Zertuche cannot

22

establish a First Amendment violation.  (Dkt. No. 19, Defendants' Motion for Summary Judgment

23

and Memorandum of Points and Authorities in Support thereof ["Motion"] at 1.)  Zertuche has

24

conceded summary judgment and withdrawn her claims against all defendants except her supervisor,

25

Gleason.  (Dkt. No. 30, Plaintiff's Memorandum of Points and Authorities in Opposition to Motion

26
27
28

United States District Court
Northern District of California

United States District Court
Northern District of California

for Summary Judgment or, In the Alternative, Partial Summary Judgment ["Oppo."] at 1. )  The Court heard the parties' arguments on October 9, 2012.

Having carefully considered the papers submitted, the admissible evidence, and the pleadings in this action, and for the reasons set forth below, the Court:

(1) **GRANTS** Defendants' motion as to the County, Eovino, and Maruffi on the grounds that Zertuche has withdrawn her claims against them, and

(2) **DENIES** the motion as to Gleason on the grounds that: (a) there are triable issues of fact as to whether his conduct violated Zertuche's First Amendment rights; and (b) taking the evidence in the light most favorable to Zertuche, as the Court must do on summary judgment, Gleason is not entitled to qualified immunity.

## BACKGROUND

Zertuche brings this action for retaliation in violation of her First Amendment free speech rights under 42 U.S.C. § 1983.  She alleges that Gleason retaliated against her for speech made outside the scope of her job duties on a matter of public concern, "namely whether the County was operating the [Independent Defense Counsel Office] in a proper and ethical manner."  (Dkt. 1, Complaint, ¶ 17.)  Zertuche alleges that, following her complaints to management concerning a breach of County ethics policies, she was treated harshly by Gleason, given a poor performance rating, and reassigned to a different unit within the County Counsel's office.  (*Id*. at ¶ 14, 15.)

*A. The Independent Defense Counsel's Office*

Zertuche is a legal secretary in the Office of the County Counsel, County of Santa Clara.  (Affidavit of Sandra Eovino [Dkt. No. 24, "Eovino Aff."] ¶ 2.)  Between 2008 and December 22, 2010, she was assigned to the Independent Defense Counsel Office ("IDO").  (*Id*.)  IDO serves as a criminal defense attorney referral agency.  (Affidavit of James Gleason [Dkt. No. 25, "Gleason Aff."] ¶ 2.)  Matters are referred to IDO when the Office of the Public Defender or the Office of the

Alternate Defender has a conflict of interest.  (*Id.*)  IDO then reviews the cases and, with the exception of representing parents charged with contempt in child support matters, refers cases to private defense attorneys through its panel network program.  (*Id.*)  On most matters, IDO plays a limited role, providing recommendations for experts or other specialists, as well as reviewing and approving invoices for payment submitted by panel attorneys.

Although the Office of the County Counsel oversees IDO, because IDO is a conflicts referral program, it is required to operate autonomously from County Counsel.  Two policies ensure that IDO maintains an autonomous operation to protect attorney-client confidences: (1) the County of Santa Clara, Office of the County Counsel, Office Administrative Policies, 6.14 ("Administrative Ethical Wall Policy"), and (2) the Office of County Counsel's Ethical Wall Policy Statement for the Independent Defense Counsel Office ("IDO Ethical Wall Policy Statement").  (Eovino Aff. ¶ 3, Exh. A and B, collectively "the Ethical Wall Policy".)  The IDO Ethical Wall Policy Statement includes the following:

> Every attorney, paralegal, and staff member working for County Counsel and IDO will be instructed on this policy and shall be expected to strictly adhere to the policy to ensure that client confidences are maintained at all times and to ensure the absolute separation between County Counsel and IDO.

(*Id.*, Exh. B ¶13.)  The Administrative Ethical Wall Policy provides, in relevant part, "[a]ll staff will be trained on this policy and shall be expected to ensure client confidences are maintained."  (*Id.*, Exh.A, p. 3.)[1]

In 2010, Gleason was the Director of IDO.  (Gleason Aff. ¶ 1-2.)  The IDO was also staffed by two full-time attorneys, one part-time attorney, one paralegal, Ngoc Lam ("Lam"), and a legal

---

[1]  All County Counsel and IDO employees are required to sign an acknowledgment of receipt for each policy.  (Eovino Aff. ¶ 3.)  On May 5, 2008, Plaintiff acknowledged receipt of County Counsel's Office Administrative Policies regarding Ethical Walls and the Ethical Wall Policy.  (*Id.*, Exh. C; Adams Dec.Exh. 1 at 131:25-135:1.)

United States District Court
Northern District of California

United States District Court
Northern District of California

secretary, Zertuche.  (*Id.* at ¶3.)  Zertuche provided administrative support to Gleason and IDO staff attorneys.  (Declaration of Hosetta Zertuche [Dkt. 32, "Zertuche Dec."] ¶ 2.)  Although not specifically included in her job duties, Gleason and Zertuche also established a practice whereby she was permitted to select which panel attorneys would be assigned to Level 1 and Level 2 cases,[2] after reviewing the information she received from counsel or from the court, without needing Gleason's approval.  (Declaration of Michael E. Adams [Dkt. Nos. 33-37, 40-42, "Adams Dec."], Exh. 1 at 103:14-104.)  On higher level cases, if Gleason was not in the office to take the referral personally, Zertuche would speak with the attorney or court staff, briefing Gleason and recommending the appropriate match when he returned.  (*Id.* at 106:3-20.)  Gleason acknowledged that selecting attorneys for referrals and recommending referrals to him was one of Zertuche's favorite aspects of the job.  (Adams Dec., Exh. 4 at 45:8-11.)

While Gleason assigned work to Zertuche, Zertuche officially reported to her administrative manager.  Until May 24, 2010, that administrative manager was Barbara Stimac ("Stimac"), and thereafter it was Maruffi. (Affidavit of Kimberly Maruffi ("Maruffi Aff.") ¶ 2.)

Sometime in April or May of 2010, Lam, the paralegal, was transferred from IDO to County Counsel's Probate Department.  (Zertuche Dec. ¶ 3.)  Although Lam was no longer working for IDO, Zertuche observed that Lam returned to the IDO offices almost daily to visit Gleason and others, and performed some work on IDO administrative matters.  (*Id.* ¶¶ 3-4.)[3]  On one occasion in mid-2010, Zertuche entered Gleason's office to find Lam handling invoices submitted by IDO panel attorneys.  (*Id.* ¶ 3.)  Invoices occasionally include information such as the names of criminal defendants being

---

[2]  Level 1 and 2 misdemeanor cases represent the least violent offenders.

[3]  Gleason testified that he and Lam were in a romantic relationship from June 2010 to November or December of 2010.  (Adams Dec.Exh. 4 at 20:7-21:1.)  He also testified that Lam visited him at the IDO offices on a daily basis from April 2010, when she transferred out of IDO to Probate, until late October 2010, when her supervisor directed her to limit, and then later to cease, her visits to IDO.  (*Id.* at 21:23-23:24.)

United States District Court
Northern District of California

represented by panel attorneys, the criminal charges against the defendants, and information regarding how panel attorneys are approaching representation of their clients.  (*Id.*)  On another occasion, unbeknownst to Zertuche, Lam was standing in the doorway to Gleason's office while Zertuche was briefing Gleason on criminal cases that had been referred to the IDO.  (*Id.*)  Zertuche noticed other instances in which Lam was nearby and within earshot while she was in the midst of discussing confidential information about new or existing IDO clients on the phone with Gleason or other IDO staff.  (*Id.*)

Zertuche believed that Lam's visits to IDO and work on IDO matters after she had transferred to a different department constituted a breach of the Ethical Wall Policy.  (Zertuche Dec. ¶¶ 4, 10.)  Zertuche approached Gleason and expressed her concern that Lam's visits to IDO likely violated the Ethical Wall Policy.  (*Id.* ¶ 4.)  Gleason indicated there was no reason for concern.  (*Id.*)

Zertuche then expressed her concerns to Stimac (now Lam's administrative manager) and Maruffi.  (Zertuche Dec. ¶ 4.)  On October 28, 2010, Zertuche sent an email to Stimac and Maruffi regarding Lam's presence in the IDO office area.  (Zertuche Dec., Exh. 1.)  In early November, Zertuche met with Maruffi to discuss her concerns that Lam's visits violated the Ethical Wall Policy. (*Id.* ¶ 4.)

Sometime shortly after that meeting, Maruffi and Stimac met with Gleason to inform him that Zertuche had complained about Lam's frequent visits to IDO.  They told Gleason that Lam was going to be restricted from visiting other than at break times.  (Adams Dec., Exh. 4 at 106:24-107:8.) Maruffi testified that during this meeting, she and Stimac told Gleason that Zertuche's complaints were based on the Ethical Wall Policy.  (Adams Dec., Exh. 2 ["Maruffi Depo."] at 60:24-61:4, 62:12-20.)  Maruffi thereafter conveyed to Zertuche that Lam had been told to limit her IDO visits to break time only.  (Adams Dec., Exh. 4 at 23:10-14, 106:24-107:8.)

Around this same time period, Sandra Eovino, County Counsel's Administrative Services Manager, became aware of Zertuche's complaints and began to investigate Lam's presence in the IDO offices.  Stimac showed Zertuche's email to Eovino around October 29, 2010.  (Adams Dec., Exh. 3 at 24:11-26:2.)  On or about November 4, 2010, Eovino met with Gleason about Lam's frequent visits to IDO.  (*Id.* at 26:1-27:10; Adam Dec., Exh. 4 at 107:22-108:10.)  Gleason indicated that Lam was performing work for IDO.  Eovino asked if Lam had signed a confidentiality agreement pursuant to the Ethical Wall Policy.  (Adams Dec., Exh. 3 at 27:16-28:11.)  Eovino then informed Gleason that Lam was barred from all further visits to IDO, and that Lam needed to sign a confidentiality agreement in order to continue the work that she had been conducting for IDO panel attorneys.  (Adams Dec., Exh. 4 at 108:2-10, 123:12-124:33.)

Beginning shortly after his meeting with Eovino, Gleason began treating Zertuche "in a consistently angry and harsh manner that contrasted starkly with the consistently genial manner" he had shown her before.  (Affidavit of John L. Winchester [Dkt. 22, "Winchester Aff."] Exh. A at 91:25-95:18.)  Within a week of the meeting with Eovino, Gleason stopped allowing her to make panel referrals of level 1 and level 2 misdemeanor cases as he had before.  (*Id.* at 103:9-104:17, 106:21-107:8.)

Zertuche was due for her annual performance evaluation around this same time period.  About one month prior to her December 2010 evaluation date, Zertuche spoke with Maruffi who assured her that she had "no worries [about the evaluation] because everyone loved [Zertuche]." (Zertuche Dec. ¶15.)  Sometime shortly after Gleason's meeting with Eovino, in early December, Maruffi solicited input about Zertuche's evaluation from others, including Gleason.  Gleason completed a form, which he submitted to Maruffi, rating Zertuche as "excellent" in most categories, and "good" or "acceptable" in others, but with one "unsatisfactory" rating in the category of "work relationships."  (Adams Dec., Exh 5.)  When Maruffi asked Gleason to explain his "unsatisfactory"

6

United States District Court
Northern District of California

rating, Gleason sent an email, on December 13, 2010, stating that the rating "reflects my disappointment in the way she has conducted herself with respect to [co-workers, including Lam]. In each of those instances, there was little attempt made at conciliation or consensus, and in some cases she showed a viciousness that continues to trouble me." (Adams Dec., Exh. 6.)

On December 20, 2010, Zertuche received her annual performance appraisal from Maruffi, which included an "Improvement Needed" rating in the "Work Relationships" section. (Maruffi Aff. ¶ 5, Exh. B, p. 1.) Repeating almost verbatim Gleason's email comments, Maruffi noted in the Supervisor Comments section of the performance appraisal as follows:

> Specifically, Hosetta [Zertuche] has had instances of conflict with both her peers and her former supervisor. In each instance, Hosetta *has made little attempt at reconciliation or consensus and, in some cases, has shown an inappropriate harshness* toward the other party.

(*Id.* at p. 3, Supervisor Comments, emphasis supplied.) At the same time, Maruffi complimented Zertuche on her knowledge and professionalism with those outside the office. (*Id.*) In the remaining six categories of the appraisal, Zertuche received two "Above Standard" ratings and four "Meets Standards" ratings. (*Id.*)

Zertuche objected to the "Improvement Needed" rating and, two days later, on December 22, 2010, a meeting was scheduled between Zertuche, Maruffi, and Eovino. (Adams Dec., Exh. 1 at 76:13-79:4.) Zertuche expressed her belief that Gleason had pressured Maruffi to give her a negative rating as retaliation for making complaints about Lam's visits to IDO and because Lam and Gleason were romantically involved. (Zertuche Dec. ¶ 12.) During the meeting, Eovino informed Zertuche that she was unwilling to overrule Maruffi's "improvement needed" rating of Zertuche based upon her own observations of Zertuche's behavior. (Eovino Aff. ¶ 4; Adams Dec., Exh. 1 at 76:6-78:2.) Eovino stated that employee Beverly Gutierrez had come to Eovino about a comment that Zertuche had made at a staff meeting and requested that Zertuche be "spoken to" regarding the spreading of

United States District Court
Northern District of California

"malicious misinformation."  (Eovino Aff. ¶ 4, Exh. D.)  Eovino recounted a recent staff Christmas luncheon during which Eovino believed Zertuche had been loud and aggressive in playing a group game.  (Eovino Aff. ¶4.)  Eovino also mentioned Zertuche's poor relationship with one employee, as well as a bickering email conversation between Zertuche and another employee resulting in an admonishment to them to stop their email string. (Eovino Aff. ¶ 4, Exh. E.)

Immediately after that meeting, Eovino met with Maruffi and other County Counsel supervisors to "preemptively look at options if she [Eovino], in fact, had to move [Zertuche] out of IDO."  (Adams Dec., Exh. 2 at 166:17-24.)

Later that same day, Eovino met one-to-one with Zertuche and informed her that she was being transferred out of IDO.  (Zertuche Dec. ¶ 13.)  Zertuche protested and argued that, because she had done nothing wrong, Gleason should be the one to be transferred.  (*Id.*)  Eovino replied that Gleason was too important to transfer.  (*Id.*)  Upset over the low performance rating and the transfer, Zertuche took a 10-week medical leave of absence, after which she returned to work in the non-IDO department to which Eovino had transferred her. (Zertuche Dec. ¶ 13.)

Eovino's declaration in support of summary judgment avers that she did not base her "conclusions concerning Ms. Zertuche's Appraisal on any complaints Zertuche made concerning her perceived belief that the Ethical Wall Policy for IDO was being violated by employee Ngoc Lam's presence in IDO."  (Eovino Aff.  ¶5.)  Maruffi testified that she believed Eovino's decision to transfer Zertuche was motivated by a concern about how well Zertuche could work with Gleason since Zertuche had disclosed that Gleason and Lam were involved romantically.  (Maruffi Depo. at 168:20-169:18.)

## STANDARD APPLICABLE TO THE MOTION

Summary judgment is appropriate when no genuine dispute as to any material fact exists and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  A party seeking

summary judgment bears the initial burden of informing the court of the basis for its motion, and of identifying those portions of the pleadings, depositions, discovery responses, and affidavits that demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Material facts are those that might affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The "mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Id.* at 247–48 (emphasis in original) (dispute as to a material fact is "genuine" if there is sufficient evidence for a reasonable jury to return a verdict for the non-moving party).

When deciding a summary judgment motion, a court must view the evidence in the light most favorable to the non-moving party and draw all justifiable inferences in its favor. *Anderson*, 477 U.S. at 255; *Huppert v. City of Pittsburg,* 574 F.3d 696, 701 (9th Cir. 2009). Where the non-moving party bears the burden of proof at trial, the moving party can prevail by demonstrating that the non-moving party lacks evidence to support its case. *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007). If the moving party meets its initial burden, the opposing party must then set out "specific facts" showing a genuine issue for trial in order to defeat the motion. *Id.* (quoting *Anderson*, 477 U.S. at 250). However, as to issues on which the moving party bears the burden of proof, it must affirmatively demonstrate that no reasonable trier of fact could find for the non-moving party. *Id.* at 984.

## DISCUSSION

Gleason argues that Zertuche cannot establish a First Amendment violation and, even if she could, Gleason is entitled to qualified immunity. The analytical framework for a qualified immunity analysis, as set forth by the U.S. Supreme Court in *Saucier v. Katz,* 533 U.S. 194, is a two-part inquiry looking to whether: (1) the facts alleged, taken in the light most favorable to the party

9

asserting the injury, show that the defendant's conduct violated a constitutional right; and (2) that

right was clearly established "in light of the specific context of the case." *Id.* at 201, modified by

*Pearson v. Callahan,* 555 U.S. 223 (2009); *see also Clairmont v. Sound Mental Health*, 632 F.3d

1091, 1100 (9th Cir. 2011) (utilizing *Saucier* test in the context of review of summary judgment in a

First Amendment retaliation case).  A court may address the two questions in whichever order it

deems appropriate.  *Pearson,* 555 U.S. at 236.  Because both summary judgment grounds here

require consideration of Zertuche's ability to establish the merits of her First Amendment retaliation

claim, the Court turns to that question first.

## I.   RETALIATION FOR EXERCISE OF FIRST AMENDMENT RIGHTS

While a government employer may regulate the speech of its public employees to a certain

degree, it may not abuse its position as employer to stifle "'the First Amendment rights [its

employees] would otherwise enjoy as citizens to comment on matters of public interest.'" *Eng v.*

*Cooley*, 552 F.3d 1062, 1070 (9th Cir. 2009) (quoting *Pickering v. Bd. of Educ.,* 391 U.S. 563, 568

(1968)).  Acknowledging the limits on the government's ability to silence its employees, the

Supreme Court has explained that "[t]he problem in any case is to arrive at a balance between the

interests of the [public employee], as a citizen, in commenting upon matters of public concern and

the interest of the State, as an employer, in promoting the efficiency of the public services it

performs through its employees."  *Pickering,* 391 U.S. at 568.

To determine whether a plaintiff has established a First Amendment retaliation claim against

a government employer, courts conduct a sequential, five-step inquiry, namely whether: (1) the

speech at issue was a matter of public concern; (2) the plaintiff spoke as a private citizen or a public

employee; (3) the speech was a substantial or motivating factor in the adverse employment action;

(4) the state employer had an adequate justification for treating the employee differently from

members of the general public; and (5) the state employer would have taken the adverse employment

United States District Court
Northern District of California

action even absent the speech.  *Eng,* 552 F.3d at 1070 (*citing Pickering*, 391 U.S. at 568).  The plaintiff bears the burden of establishing the first three elements.  If the plaintiff succeeds, the government employer bears the burden of either justifying the alleged adverse action by showing that its "legitimate administrative interests outweigh [plaintiff's] First Amendment rights," or establishing it would have made the same decision regardless of the protected conduct.  *Thomas v. City of Beaverton*, 379 F.3d 802, 808 (9th Cir. 2004).

### A.   SPEECH ON A MATTER OF PUBLIC CONCERN

To establish a First Amendment retaliation claim, a plaintiff first must show that the speech at issue involved a matter of public concern.  The "public concern inquiry is purely a question of law," *Gibson v. Office of Atty. Gen., State of California*, 561 F.3d 920, 925 (9th Cir. 2009) (quoting *Eng,* 552 F.3d at 1070).  The scope of the public concern element is defined broadly.  *Desrochers v. City of San Bernadino*, 572 F.3d 703, 710 (9th Cir. 2009).  In determining whether speech is on a matter of public concern, courts look to "'content, form, and context of a given statement, as revealed by the whole record.'" *Ulrich v. City and County of San Francisco,* 308 F.3d 968, 978 (9th Cir. 2002) (quoting *Connick v. Myers,* 461 U.S. 138, 147-48 & n.7 (1983)).  Foremost of these is the content of the speech.  *See Clairmont,* 632 F.3d at 1103; *Desrochers,* 572 F.3d at 710.

"Speech involves a matter of public concern when it can fairly be considered to relate to 'any matter of political, social, or other concern to the community.'" *Johnson v. Multnomah County, Or.,* 48 F.3d 420, 422 (9th Cir.1995) (*quoting Connick,* 461 U.S. at 146).  For example, speech revealing "'[u]nlawful conduct by a government employee or illegal activity within a government agency'" addresses matters of public concern.  *Huppert v. City of Pittsburg*, 574 F.3d 696, 704 (9th Cir. 2009) (quoting *Thomas v. City of Beaverton,* 379 F.3d 802, 809 (9th Cir.2004)).  Likewise, speech related to potential government ethics violations, including conflicts of interest, implicates matters of public concern.  *See, e.g., Marable v. Nitchman*, 511 F.3d 924, 932 (9th Cir. 2007) (complaints about

United States District Court
Northern District of California

unethical conduct and government waste were matters of public concern); *Anthoine v. N. Cent. Counties Consortium*, 605 F.3d 740, 748-49 (9th Cir. 2010) (speech concerning agency's failure to comply with its legal obligations is a matter of public concern); *Kirchmann v. Lake Elsinore Unified Sch. Dist.*, 57 Cal. App. 4th 595, 603 (1997) (citing *Vasquez v. City of Bell Gardens,* 938 F.Supp. 1487, 1496 (C.D.Cal.1996) (city manager's speech regarding conflict of interest of city councilperson concerned matter of public concern)).  Moreover, if statements present mixed questions of private and public concerns, they are still considered protected speech.  *Posey v Lake Pend Oreille School Dist. No. 84,* 546 F.3d 1121, 1130 n. 5 (9th Cir. 2008).

Two Ninth Circuit cases are instructive.  In *Desrochers*, complaints by two police officers were found not to involve protected speech.  *Desrochers,* 572 F.3d at 718-19.  There, plaintiff-police sergeants filed an informal grievance against their supervisor, a lieutenant, alleging that there was "an ongoing and continuing issue relative to a difference of personalities between the four sergeants" and the lieutenant, and that the problem had risen to a level that it was impacting the operational efficiency of the police units he supervised.  *Desrochers*, 572 F.3d at 705.  With respect to the content, the plaintiffs urged that their grievance involved matters of public concern because they related to the preparedness and morale of a vital public safety institution.  The Ninth Circuit disagreed.  "[T]he reality that poor interpersonal relationships amongst coworkers might hamper the work of a government office does not automatically transform speech on such issues into speech on a matter of public concern." *Id.* at 711.  Looking to the question of form, the *Desrochers* court held that the fact that the speech was an internal employee grievance, rather than speech in a more publicly-visible forum, favored finding that it was not protected.  *Id.* at 714.  While the fact that an employee "'expressed his views inside his office, rather than publicly, is not dispositive,'" the fact that speech is made in a manner intended to reach only a limited audience rather than the public more generally weighs against a claim that it is protected.  *Id.* (*quoting Garcetti v. Ceballos*, 547 U.S. 410,

420 (2006)).  Finally, examining the context of the speech, the court held that the reasons and motivations for plaintiffs' speech appeared to be more in the nature of a personal power struggle and dissatisfaction with their employment situation.  *Id.* at 715.  Despite the plaintiffs' after-the-fact characterizations of the grievances, the language of the grievances themselves was focused on the interpersonal and personnel issues in the police unit, not any potential wrongdoing or breach of the public trust.  *Id.* at 712.

By contrast, in *Karl v. City of Mountlake*, 678 F. 3d 1062 (9th Cir. 2012), the Ninth Circuit held that a police secretary's testimony given in a civil rights lawsuit filed by a former employee constituted protected speech.  There, a former police employee subpoenaed plaintiff to give deposition testimony in a civil rights action brought against the police department.  *Id.* at 1066.  Plaintiff alleged that after she testified unfavorably to her supervisors at the department, she suffered various adverse employment actions including a punitive transfer and subsequent termination.  *Id.* at 1067.  The court determined the testimony was a matter of public concern because it was "offered in the course of a § 1983 lawsuit alleging violations of constitutional rights," that "clearly implicated the exposure of 'significant government misconduct.'" *Id.* at 1069-1070.

Here, statements revealing breaches of an ethical wall policy within the office of the County Counsel implicate matters of public concern.  Failure to maintain the ethical wall can risk violating attorney-client privilege, breaching the duties the attorneys owe to their clients, and undermining the public's trust in the County Counsel office.

Rather than argue that speech on this subject would not be a matter of public concern, Gleason instead contends that Zertuche's complaints had little to do with the Ethical Wall Policy but rather were focused on personal grievances.  However, the record shows that Zertuche's complaints regarding Lam's presence in IDO specifically referenced the ethics policies, and implicated the ethical operation of the Independent Defender's Office.  Her complaints to her superiors involved

United States District Court
Northern District of California

allegations that an IDO employee was violating a county policy designed to protect confidentiality between criminal defendants and their lawyers.  Zertuche testified that she complained about the alleged violations because "it got to the point where it was so ethically, morally wrong, what was going on in front of my eyes, that I just had to bring it to my manager's attention." (Adams Dec., Exh. 1 at 385:25-392:10.)[4]  Maruffi testified that she and Stimac met with Gleason and told him that Zertuche had made complaints based on the Ethical Wall Policy.  (Adams Dec., Exh. 2 at 60:24-61:4.)  After investigating Zertuche's complaints and speaking with Gleason, Eovino told him that he must have Lam execute a confidentiality agreement to continue the work she had been doing for IDO attorneys.  (*See* Adams Dec., Exh. 3 at 27:1-22.)  Both Zertuche's testimony and the testimony of County employees confirm that Zertuche's complaints were understood to touch upon Ethical Wall concerns.  The summary judgment record indicates that she was raising the potential confidentiality ramifications of Lam's activities in the IDO offices, not merely speaking about personal grievances against her co-workers.  Moreover, and unlike *Desrochers*, the evidence indicates that the public concern aspect of Zertuche's complaints is not an after-the-fact justification but a belief and motivation she held contemporaneous with the speech.  Further, even if other concerns might also have motivated her complaint, statements that present mixed questions of private and public concerns may still be considered protected speech.  *Posey,* 546 F.3d at 1130.  Thus, the speech here implicated matters of public concern.

### B.   SPEECH AS A PRIVATE CITIZEN OR A PUBLIC EMPLOYEE

The second element on which Zertuche bears the ultimate burden is whether the speech in question was made in her capacity as a private citizen rather than her job as a public servant.  Public

---

[4]   Furthermore, the fact that Plaintiff's complaints were made internally, rather than in a public forum, does not warrant a conclusion that they were not on matters of public concern.  While the forum in which the speech is made is certainly a factor that may weigh against finding speech protected, it is not dispositive.  *See Desrochers,* 572 F.3d at 714.

employees do not speak as citizens for First Amendment purposes when they "make statements pursuant to their official duties[.]" *Garcetti,* 547 U.S. at 421.  If the speech was made on account of the speaker's official job duties or as a product of performing the tasks she was paid to perform, it is not protected.  *Eng,* 552 F.3d at 1071.  Restricting speech that owes its existence to a public employee's professional responsibilities does not infringe any liberties the employee might have enjoyed as a private citizen.  *Garcetti,* 547 U.S. at 422.

Whether the plaintiff spoke as a public employee or as a private citizen is a mixed question of fact and law.  While "the scope and content of a plaintiff's job responsibilities is a question of fact. . . the ultimate constitutional significance of the facts as found" is a question of law.  *Posey,* 546 F.3d at 1129.  Determining what responsibilities constitute a public employee's "official duties" is a practical inquiry, not delimited by the employee's job description.  *Garcetti,* 547 U.S. at 424-25.

In *Garcetti,* the Supreme Court held that a deputy district attorney's speech critical of a search warrant affidavit, including his belief that the affidavit contained "serious misrepresentations," was not protected speech because the speech was made within a case memorandum.  *Id.* at 426.  Because writing the case memorandum, and offering the assessment contained therein, was part of the deputy DA's official duties, the Court found that he was speaking as a public employee rather than a private citizen and his speech was not constitutionally protected.  *Id.* at 424.  While affirming that public employee speech "[e]xposing governmental inefficiency and misconduct is a matter of considerable significance," the fact that the speech was made as a part of the employees' official duties meant that it was not protected.  *Id.* at 425-26.

Citing *Garcetti,* Defendants argue that Zertuche's Ethical Wall complaints were made pursuant to her official duties as an IDO employee, with the result that her complaints are not constitutionally protected speech.  There is, at best, a dispute of fact as to whether Zertuche made her complaints pursuant to her official duties.  Zertuche initially testified that it was her "duty" as an

United States District Court
Northern District of California

employee of County Counsel's office to "uphold the standards of our mission statement," including

notifying management of any suspected violations of the Ethical Wall Policy.  (Winchester Aff.,

Exh. A at 192:1-193:14.)  In the same deposition, she also testified that she was never told that her

duties as a legal secretary included monitoring and reporting such violations.  (*Id.* at 385:25-392:10.)

In connection with her opposition to this motion, Zertuche submitted a declaration in which she

repeated her assertion that no one ever informed her of any duty as a legal secretary to report Ethical

Wall violations, nor did she ever read any document that imposed such a duty.  (Zertuche Dec. at

3:11-16.)[5]  The policy itself, while requiring compliance by employees, does not mention a duty to

report violations to management.  (Eovino Aff., Exh. B.)  Instead, the policy states only that "every

attorney, paralegal, and staff member working for the County Counsel and IDO...shall be

expected…to ensure the absolute separation between County Counsel and IDO."  (*Id.* at 3.)  Other

than Zertuche's somewhat equivocal testimony, Defendants have offered no evidence to support

their argument that reporting Ethical Wall Policy violations was part of Zertuche's job duties.

   As the Ninth Circuit has stated, "if there is a genuine issue of material fact as to whether

speech was made pursuant to a plaintiff's official duties, that issue may not be treated as a question

of law to be resolved at summary judgment, [r]ather, it must be treated as a question of fact to be

resolved in a fact-finding proceeding."  *Huppert v. City of Pittsburg*, 574 F.3d 696, 718-19 (9th Cir.

---

[5]  While Defendants argue that the contrary testimony and affidavit of Plaintiff should not be
considered by the Court under the sham affidavit rule, not every statement that contradicts another is
excluded by this evidentiary principle.  *See Van Arsdale v. International Game Tech.*, 577 F.3d 989,
998 (9th Cir. 2009).  Because "[a]ggressive invocation of the rule also threatens to ensnare parties
who may have simply been confused during their deposition testimony and may encourage
gamesmanship by opposing attorneys," the rule is applied with caution.  *Id.*  Here, the evidence
suggests that Plaintiff used the term "duty" interchangeably to refer to actual job responsibilities and
to her own internal moral sense of what she thought she ought to do.  The Court will not exclude the
"contradictory" testimony in Plaintiff's deposition or in her declaration in opposition to the motion.

2009).  Because the Court must view all evidence in the light most favorable to Zertuche and draw all reasonable inferences in her favor, the Court cannot resolve this factor as a matter of law.

**C.    ADVERSE ACTION**

The third inquiry is whether Defendant "took adverse action... [and the plaintiff's] speech was a 'substantial or motivating factor' behind the adverse action."  *Frietag v. Ayers,* 468 F.3d 528, 543 (9th Cir. 2006) (quoting *Coszalter v. City of Salem,* 320 F.3d 968, 973 (9th Cir. 2003)).  An adverse employment action is any act likely to deter an objectively reasonable employee from making the constitutionally protected speech at issue.  *See Burlington Northern & Santa Fe Railroad v. White,* 548 U.S. 53, 68 (2006) ("*Burlington*"); *Coszalter,* 320 F.3d at 976 (stating that the test for adverse action in Title VII and § 1983 cases are functionally equivalent).  As a general matter petty slights, minor annoyances, or "snubbing" by supervisors and co-workers are not adverse employment actions.  *Burlington,* 548 U.S. at 68.  However, the conduct need not rise to the level of a taking away a benefit or privilege, and need not be of any particular type or severity, in order to be considered an "action designed to retaliate against and chill political expression."  *Coszalter,* 320 F.3d at 976 (*quoting Thomas v. Carpenter*, 881 F.2d 828, 829 (9th Cir. 1989)).

In *Thomas v. Carpenter*, the court found that a plaintiff's allegations that he had been banned from attending meetings and participating in training exercises were sufficient to support his First Amendment retaliation claim.  *Thomas*, 881 F.2d at 829.  Similarly, in *Anderson v. Central Point School District*, 746 F.2d 505, 506 (9th Cir. 1984), the court found adverse action where the plaintiff alleged he was temporarily suspended from his coaching duties and insulted by his employer in response to a letter the plaintiff had written to the school board criticizing school athletic policies.

Here, Gleason argues that he took no adverse action against Zertuche.  Taking the evidence in the light most favorable to Zertuche, the record shows that Gleason: (1) began treating Zertuche in an unfriendly and angry manner, in contrast to their earlier relationship, including glaring at her and

stomping his feet, shortly after his meeting with Eovino; (2) stopped allowing Zertuche to assign level 1 and 2 cases as she had done before; and (3) recommended to Maruffi that Zertuche be rated as "Unsatisfactory" in the workplace relationships category on her annual performance evaluation. Most significantly, Zertuche also asserts that she would not have been transferred out of IDO were it not for Gleason's harsh critique of her work performance to Maruffi, resulting in an "improvement needed" rating on her annual evaluation. Zertuche contends these events led her to appeal the evaluation and led Eovino to transfer her to another department.

Gleason's unfriendly treatment, standing alone, does not rise to the level of adverse action but falls more into the category of petty annoyances and snubbings the Supreme Court discussed in *Burlington*. However, the change in Zertuche's work duties and the low rating on her performance evaluation present more difficult questions. While Gleason argues that assignment of level 1 and 2 cases was his job duty, not Zertuche's, both Gleason and Zertuche testified that it became "common practice" for Zertuche to make the referrals with Gleason's approval as needed. (Adams Dec., Exh. 1 at 107:19-108:22; Exh. 4 at 42:12-44:3.) There is no evidence that removal of that job task impacted Zertuche's continued employment in any significant way except that it was a task she enjoyed and Gleason took it away under circumstances Zertuche believed were pretextual. Similarly, the rules applicable to performance evaluations with the County Counsel's office meant that the annual employee appraisal would have no effect on any employment matters, such as discipline, promotions or other benefits.[6] However, Zertuche contends that the negative rating on the

---

[6] Plaintiff's performance appraisal was guided by the Performance Appraisal Program Agreement ("PAPA") between the County of Santa Clara and Service Employees International Union (SEIU) Local 521 (formerly 715). (Maruffi Aff. ¶ 3, Exh. A, Preamble.) The PAPA provides that the annual performance appraisal will not be used in the County disciplinary process, or considered by the County for the purpose of lateral transfers or for the purpose of promotions. (*Id.*, Section V. Guidelines, nos. 3 and 5.) The PAPA will be removed from the employee's personnel file in the event a hiring authority or management requests to review the personnel file for discipline, lateral transfers or promotions. (*Id.* at no. 4.) Plaintiff understood that her performance appraisal

United States District Court
Northern District of California

United States District Court
Northern District of California

evaluation ultimately led to Zertuche's involuntary transfer out of IDO, a consequence that would not have occurred "but for" Gleason's strongly negative recommendation to Maruffi.

Zertuche's burden at this step is to show that her protected speech was a "substantial or motivating factor" that led to the adverse action. *See Eng,* 552 F.3d at 1071; *Frietag,* 468 F.3d at 543. "[I]n evaluating whether the government's adverse employment action was motivated by the employee's speech, we must assume the truth of the plaintiff's allegations." *Eng*, 552 F.3d at 1071. Based upon the evidence before the Court, and the reasonable inferences that can be drawn from that evidence, a jury could reasonably find that Zertuche's Ethical Wall Policy complaints were a substantial or motivating factor that led to her transfer out of IDO.

### D. CAUSATION

Once a plaintiff demonstrates a triable issue of fact as to whether her protected speech was a substantial or motivating factor behind the alleged adverse action, the government must show that: (i) its legitimate administrative interests outweigh the employee's free speech rights, and thus an adequate justification for restricting speech; and (ii) it would have taken the adverse action even in the absence of plaintiff's protected speech. *Eng*, 552 F.3d at 1072 (internal citations and quotations omitted). This step, known as the "*Mt. Healthy* but-for causation" analysis, presents a purely factual question and on summary judgment, a court must assume the truth of plaintiff's version of disputed events. *Id. (citing Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977)). A court should grant immunity on this issue only if the government meets its burden to show that it would have reached the same employment decisions absent the protected speech. *Id.*

would not be considered for purposes of advancement or compensation. (Adams Dec.Exh. 1 at 29:22-31:21.) Plaintiff had reached her highest position within the County and had no plans to pursue management. (*Id.*) She also concurred that the appraisal could not be used as a disciplinary step. (*Id.* at 32:4-7.)

A subordinate officer lacking the power of a final decision maker may be liable under section 1983 if the subordinate "set[s] in motion a series of acts by others which the actor knows or reasonably should know would cause others to inflict the constitutional injury."  *Gilbrook v. City of Westminster,* 177 F.3d 839, 854 (9th Cir.1999) (quoting *Johnson v. Duffy,* 588 F.2d 740, 743–44 (9th Cir.1978)).  In *Gilbrook*, although the ultimate decision maker had a legitimate reason for imposing discipline, the court found that the retaliatory motives of "two subordinates set in motion the chain of events that led" to the plaintiff's adverse employment action.  *Gilbrook*, 177 F.3d at 854.  Moreover, a subordinate officer cannot use non-retaliatory motives of her superiors to shield against liability where his superior would not have acted without the subordinate's retaliatory conduct.  *Id.* at 855.

Here, viewing the evidence in the light most favorable to Zertuche, and for the reasons discussed above, Gleason has not met his burden to show that the County, and specifically Eovino, would not have transferred Zertuche out of IDO in the absence of her Ethical Wall complaints.

## II.   QUALIFIED IMMUNITY

"Even where a plaintiff has presented sufficient evidence to show that his constitutional rights were violated, a government official may still be entitled to qualified immunity," if the right was not clearly established at the time of the violation.  *Saucier,* 533 U.S. at 201; *see also Clairmont*, 632 F.3d at 1109.  In a First Amendment retaliation case, the question is whether "existing law at the time of [defendant's conduct] provided him 'fair notice' that the First Amendment prohibits retaliating against an employee" for such speech.  *Karl*, 678 F.3d at 1073.  Here, the summary judgment record precludes judgment in favor of Gleason as to the claim of First Amendment retaliation.  However, Gleason may still be entitled to qualified immunity if the constitutional right at issue here was not clearly established in December 2010, the time of Zertuche's performance evaluation and reassignment.

United States District Court
Northern District of California

The determination of whether the right was clearly established is made under an objective, fact-specific standard. *Fogel v. Collins,* 531 F.3d 824, 833 (9th Cir. 2008). "[C]losely analogous preexisting case law is *not* required to show that a right was clearly established." *Clairmont*, 632 F.3d at 1109 (internal citations and quotations omitted, emphasis in original). While the facts of comparable cases need to bear some similarity to the case at issue, "the facts of already decided cases do not have to match precisely the facts with which [the government employer] is confronted." *Fogel,* 531 F.3d at 833. To defeat qualified immunity, a plaintiff must show that two legal propositions were clearly established: (1) that the speech was on a matter of public concern, and (2) that the employee's speech interests outweighed the government's legitimate administrative interests. *Rivero v. City of San Francisco,* 316 F.3d 857, 865 (9th Cir.2002) (citing *Hufford v. McEnaney,* 249 F.3d 1142, 1148 (9th Cir. 2001). Again, although the ultimate burden is upon plaintiff to show that the constitutional right was clearly established, on summary judgment the Court must resolve all factual disputes and draw all reasonable inferences in her favor. *Clairmont*, 632 F.3d at 1110.

On this summary judgment record, the Court finds that a reasonable official in Gleason's position, in December of 2010, would have known that it was unlawful to retaliate against an employee for making complaints pursuant to an internal ethics policy, especially where such policy implicated attorney-client confidentiality. As the Supreme Court's 2006 decision in *Garcetti* noted, governmental misconduct, particularly conduct implicating the ethical obligations of government attorneys, is a matter of public concern. *Garcetti,* 547 U.S. at 425-26. *Garcetti* made clear that the public employee exception for otherwise protected First Amendment speech was "limited in scope. . . only to the expressions an employee makes pursuant to his or her official responsibilities, not to statements or complaints (such as those at issue in cases like *Pickering* and *Connick*) that are made outside the duties of employment." *Garcetti*, 547 U.S. at 424.

United States District Court
Northern District of California

Following *Garcetti*, in 2009, the Ninth Circuit held in *Eng* that speech commenting on unethical conduct in a district attorney's office was unquestionably a matter of public concern.  *Eng,* 552 F.3d at 1076-76; *see also Marable*, 511 F.3d at 932 (employee's ethics complaint about "pay padding" and waste of public funds "has all of the hallmarks that we normally associate with constitutionally protected speech"); *Anthoine*, 605 F.3d at 748-49 (report regarding the agency's failure to comply with its legal obligations was clearly on a matter of public concern).  Likewise, in *Eng*, the Ninth Circuit clarified that an employee speaks as a private citizen when he has no official duty to make such complaints, even under circumstances where the employee learned the facts of the misconduct in the course of conducting an investigation that was part of his job duties.  *Eng,* 552 F.3d at 1064-65, 1073.  In order for the narrow public employee exception to apply, the speech must be "the *product* of performing the tasks the employee was paid to perform."  *Eng,* 552 F.3d at 1071 (quoting *Frietag,* 468 F.3d at 544) (emphasis supplied).

Citing *Dible v. City of Chandler*, 502 F.3d 1040, 1051 (9th Cir. 2007),[7] Gleason argues that the fact-intensive, context-specific nature of a First Amendment retaliation claim means that a plaintiff can rarely, if ever, show that the law is "clearly established" for purposes of qualified immunity.  First, the quoted statement is plainly dicta.  The decision in *Dible* focused on the weakness of the Constitutional violation: a First Amendment retaliation claim brought by a police officer fired for operating a pornographic website, which brought discredit on the police department, and for lying about the website to investigators.  *Dible,* 515 F.3d 920-21.  The Ninth Circuit had no trouble finding, consistent with the U.S. Supreme Court's decision in *City of San Diego v. Roe,* 543 U.S. 77 (2004), that the police officer's "vulgar behavior" was far outside the bounds of "speech on a matter of public concern," and that the police department's interests in the efficient operation far

---

[7]  The Court notes that the *Dible* decision cited by Gleason was amended and superseded by *Dible v. City of Chandler,* 515 F.3d 918 (9th Cir. 2008).  The amendments are not significant for purposes of this order.

United States District Court
Northern District of California

outweighed any free speech concerns.  *Dible,* 515 F.3d at 926-27, 928.  Thus, the court easily

concluded that there was no merit to the First Amendment claim, and therefore the police chief was

entitled to qualified immunity.  *Id.* at 930.  After so holding, the *Dible* court went on to add that

"even if we were to find a violation, we would also be constrained to declare that because 'whether a

public employee's speech is constitutionally protected turns on a context-intensive, case-by-case

balancing analysis, the law regarding such claims will rarely, if ever, be sufficiently 'clearly

established' to preclude qualified immunity.'" *Id.* (quoting *Moran v. Washington,* 147 F.3d 839, 847

(9th Cir. 1998). The *Dible* court had no occasion to consider whether the law was clearly established

at the time of the violation since its analysis did not advance beyond the lack of a First Amendment

violation.  Moreover, the Ninth Circuit's subsequent decisions in *Eng* and *Anthoine* held that the law

concerning First Amendment retaliation could, indeed, be clearly established for qualified immunity

purposes, notwithstanding the highly factual nature of the analysis.

        In sum, based upon the summary judgment record, well-established case law at the time of

the alleged violation here would have alerted a reasonable official in Gleason's position that it would

be unlawful to retaliate against an employee for making a complaint about an Ethical Wall violation.

Second, as of December 2010, the case law was sufficient to put a reasonable official on notice that a

legal secretary's complaints about ethical violations were not made pursuant to her official job duties

for purposes of a First Amendment retaliation analysis.  Third, it was well-established at the time of

Gleason's actions that "a subordinate cannot use the non[-]retaliatory motive of a superior as a shield

against liability if that superior never would have considered a dismissal but for the subordinate's

retaliatory conduct."  *Gilbrook,* 177 F.3d at 855.  Thus, the Court concludes that Gleason is not

entitled to qualified immunity on the summary judgment record.[8]

---

[8]  Gleason's arguments concerning qualified immunity are scant and focus mainly on the
contention that no reasonable public official could be held to believe that his alleged conduct –

## CONCLUSION

Based upon the foregoing, Defendant Gleason's Motion for Summary Judgment is **DENIED.** Summary judgment is **GRANTED** as to the other individuals (the County, Eovino, and Maruffi) on the grounds that Zertuche has withdrawn her claims against them.

The Court **SETS** this matter for a case management conference on Monday, May 13, 2013, at 2:00 p.m.

This Order terminates Docket No. 19.

**IT IS SO ORDERED.**

Date: April 17, 2013

_____

**YVONNE GONZALEZ ROGERS**
**UNITED STATES DISTRICT COURT JUDGE**

unfriendly interactions and provision of a critical performance evaluation – would violate any established legal authority.  (*See* Defendants' Memorandum of Points and Authorities In Support, Dkt. No. 19, at 15-16; Defendants' Reply to Plaintiff's Opposition, Dkt. No. 44, at 6-7.)  He offers no real argument that internal complaints regarding breaches of an ethics policy are not speech on a matter of public concern, nor does he argue that legitimate administrative concerns of the County Counsel's office outweighed Plaintiff's speech interests.  Likewise, Gleason does not attempt to show that no closely analogous law would have put him on notice that retaliation on these grounds would be considered unlawful.

United States District Court
Northern District of California